[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13845
Non-Argument Calendar

_____

D.C. Docket No. 3:17-cv-00645-MMH-JBT

MARY ANN PITTMAN,

Plaintiff - Appellant,

versus

JOHNSON & JOHNSON VISION CARE, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 12, 2020)

Before ROSENBAUM, JILL PRYOR and BRANCH, Circuit Judges.

PER CURIAM:

Mary Ann Pittman appeals the district court's grant of summary judgment to her employer, Johnson & Johnson Vision Care, Inc. ("JJVC"), on her claim under Title VII for sex-based discrimination in denying her a promotion. After careful review, we conclude that the district court did not err in granting summary judgment because Pittman failed to establish that JJVC's articulated reasons for not promoting her—that she lacked the requisite skills and experience—was pretext for discrimination. We therefore affirm.

## I.    BACKGROUND

Pittman is a current employee of JJVC, a subsidiary of Johnson & Johnson ("J&J"), and has been employed with J&J companies in various roles since 1983.[1] She was hired directly out of college by Ethicon, Inc., a J&J company. In 1993, she moved from Ethicon to Vistakon, which later became known as JJVC. Pittman eventually rose through the ranks at Vistakon and became the Senior Director for New Process Introduction and Life Cycle Management, a position on the supply-chain side of the company. In this role, she was supervised by Mike Alleva, the Vice President of Product Management.

---

[1] On review of an order granting a defendant's motion for summary judgment, we view the facts in the light most favorable to the plaintiff. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). In recounting the facts here, we note where facts are disputed and at this stage resolve the disputes in Pittman's favor.

JJVC used a formal internal succession planning process to identify individuals who were able and ready to move into the company's critical, higher-level positions. Managers completed succession profiles for the employees they oversaw. Managers would then meet with Mark Benson, the Vice President of Customer and Logistics Services and Consumer Medical Devices Supply Chain, and the leadership team to discuss each employee's succession profile. During these meetings, Benson and his team would discuss each employee's internal rating of preparedness for larger roles and update the employee's readiness designation based on the decisions made in the meeting. Managers were responsible for ensuring that employees' readiness designations for future positions were kept up to date on "talent cards," which contained information about whether the employee was ready for a particular position. Doc. 22-7 at 86.[2] Talent cards were not always properly maintained because maintaining them was time-consuming. They were, however, updated after succession planning meetings. Even so, PowerPoint presentations and other documents from succession planning meetings were more important. In addition to these succession-planning procedures, at their midyear and year-end evaluations employees were evaluated on two different criteria—leadership and business results.

---

[2] Citations in the form "Doc. #" refer to district court docket entries.

In 2014 and 2015, Pittman received business results ratings of "Exceeds" and leadership results ratings of "Fully Meets."  Doc. 22-2 at 79-83; Doc. 22-3 at 2-6.  Her talent card showed her target job as "Director 2, Production Plan/Sched" and rated her readiness for that position as "Ready Now."[3]  Doc. 22-3 at 4.  Pittman's talent card also reflected a "Ready Now" rating for three additional positions, including Consumer Medtech Plan Director; Vice President of Consumer Logistics Services, Global Distribution Operations; and Vice President of Product Management.  *Id.*  As Pittman's supervisor, Alleva prepared her talent card.  Alleva believed Pittman was "Ready Now" for the two Vice President positions and prepared her talent card to reflect that rating.  A PowerPoint presentation that was circulated following a succession planning meeting in May of 2015 also indicated Alleva's rating that Pittman was "Ready Now" for the two Vice President positions.

At the succession meeting, however, Pittman's succession profile was discussed, and the group determined that she was not "Ready Now" for the Vice President of Product Management role, downgrading her rating to "Ready Later."  The group determined that Pittman needed to establish stronger leadership skills and collaboration experience, as well as experience outside of Vistakon (now

---

[3] JJVC uses multiple succession plan readiness designations:  Ready Now (0-12 months); Ready Later (1-3 years); Ready Future (3-5 years); and Emerging Talent (5+ years).

4

known as JJVC). The group rated another employee, Ronnie Hawthorne, as "Ready Now" because he had more board-level experience. Despite the decision to change her readiness rating, Pittman's talent card was never updated and continued to reflect a "Ready Now" rating. Another succession planning PowerPoint indicated, however, that Pittman was "Ready Later" for the Vice President of Product Management position.

When Alleva moved to a new role internally, the Vice President of Product Management position became available. Benson had final hiring approval for the position. When Vice President positions opened, Benson would discuss potential candidates with his boss, his staff, and human-resources administrators before settling on a slate of candidates to be considered for the position. This process also included the development of a job description and a list of success criteria for the position. When internal candidates were considered for an open position, one of the factors that could be taken into consideration was their readiness rating for the role; however, readiness ratings were not dispositive, and those who were not rated "Ready Now" could still be considered.

For the Vice President of Product Management position, Benson collaborated with the Human Resources Director, Scott Montermurno, to assess the candidates, create a slate of candidates to be interviewed, and develop success criteria for the position. The success criteria that were developed included: a

strong supply chain background, strong new product introduction and innovation experience, outstanding collaboration skills, the ability to work effectively at the board or leadership team level, and the potential to continue to move up in J&J.

Benson and Montermurno began putting together an interview slate in September, and a preliminary slate was created on October 2. On October 30, Pittman expressed interest in the position to Benson and was told that she would be given full consideration. Before she let Benson know that she was interested in the position, Pittman had not been discussed as a potential candidate. After she expressed interest, Benson had numerous conversations with Montermurno about her candidacy and at one point was considering adding her to the slate. Ultimately, Pittman was not added to the interview slate. Montermurno believed she was not as strong a candidate as the other two candidates on the slate at that time.

Around 13 candidates were considered for possible placement on the interview slate, three of whom were female. Benson believed two candidates—one internal to JJVC (James Conroy) and one external (Quincy Troup)—met the identified success criteria. These two candidates were selected for interviews. After the interview slate was chosen, the Vice President for Human Resources strongly advocated for an additional candidate, Hawthorne, who was added as a third interviewee. In the end, three men interviewed for the position, and one of them, Conroy, was selected. When Benson and Pittman discussed why she was

6

not selected for an interview, Benson told her that it was because she had no experience outside of Vistakon. Conroy had several years of outside experience with Kodak, as well as other J&J divisions outside of Vistakon.

Pittman sued JJVC in district court for gender discrimination under Title VII. Her complaint alleged that JJVC discriminated against her because of her sex when it failed to promote her to Vice President of Product Management and that JJVC's reasons for passing her over for consideration for the position were inaccurate.[4] Following discovery, JJVC moved for summary judgment, arguing that Pittman could not establish a *prima facie* case of sex discrimination, and, in any event, it had legitimate nondiscriminatory reasons for its actions, which Pittman could not establish were pretextual. Specifically, JJVC asserted that it did not offer Pittman the position because Conroy had more substantial and relevant experience. The district court, adopting the report and recommendation of a magistrate judge, granted JJVC's summary judgment motion.

This is Pittman's appeal.

## II.    STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, construing the facts and drawing all reasonable inferences in favor of the

---

[4] Pittman also alleged a violation of the Florida Civil Rights Act, Fla. Stat. § 760.10. The district court granted summary to JJVC on this claim as well. Because Pittman does not raise this claim on appeal, we do not address it.

nonmoving party.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291-92 (11th Cir. 2012).  Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

### III.    DISCUSSION

Pittman argues that the district court erred in granting summary judgment in JJVC's favor.  She argues that summary judgment was improper because she established that JJVC's articulated reasons for failing to promote her to the position of Vice President of Product Management—that she lacked the requisite skills and experience and Conroy had more substantial and relevant experience— were pretextual.

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Where, as here, an employee bases her discrimination claim on circumstantial evidence, we

8

generally apply the *McDonnell Douglas* burden-shifting framework. *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Under the first step of this framework, the employee must establish a prima facie case of discrimination. *Tillman*, 526 F.3d at 1373. Establishing a prima facie case gives rise to a presumption that the adverse action was discriminatory. *Id.* The burden then shifts to the employer to rebut the presumption by articulating a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer carries its burden, the employee must then show that the employer's stated reasons were a pretext for unlawful discrimination. *Id.*

In the context of a promotion, "a plaintiff cannot prove pretext by simply arguing or even by showing that [she] was better qualified than the person who received the position [she] coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [sex]." *Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (alteration adopted) (internal quotation marks omitted). A plaintiff must establish that the "disparities between the successful applicant's and [her] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (internal quotation marks omitted). A plaintiff

satisfies her burden to show pretext by showing that the employer's proffered reason is so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find the reason unworthy of credence. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010).

For our purposes, we assume that Pittman satisfied the first step in the *McDonnell Douglas* framework and established a prima facie case of sex discrimination. The burden then shifted to JJVC to provide legitimate, nondiscriminatory reasons for its action, which it has done. *See McCann*, 526 F.3d at 1373. JJVC explained that Conroy was more qualified for the position than Pittman, who lacked the necessary skills and experience. Pittman now bears the burden to show that JJVC's stated explanation was a pretext for discrimination. *Id.* We conclude that Pittman has failed to demonstrate that JJVC's explanation for not promoting her to the Vice President position was pretextual.

Pittman advances two main arguments about pretext. First, she argues that she established that she was more qualified for the position because she had been deemed "Ready Now" for the Vice President position through JJVC's formal succession planning process, whereas Conroy did not have that designation. She contends that there is no evidence supporting JJVC's contention that her rating was changed to "Ready Later" and that JJVC made this contention only after it had already removed her from consideration for the position. Second, she argues that

10

JJVC used a set of shifting, nonspecific, and unevenly-applied criteria when it removed her from consideration for the promotion, which shows that JJVC's alleged reasons were pretextual.

As an initial matter, JJVC's rating system alone cannot establish that Pittman was more qualified to be Vice President of Product Management than Conroy. Although Benson and Alleva testified that Pittman's readiness rating was downgraded from "Ready Now" to "Ready Later," her talent card throughout the selection process reflected a "Ready Now" rating. Construing the evidence in Pittman's favor, as we must on review of summary judgment, we accept that her readiness rating for the position of Vice President of Product Development was Ready Now. Although a factor that could be taken into consideration, an employee's readiness rating for a position was not dispositive; according to JJVC policy, those who were rated Ready Now were not guaranteed an interview and those with no Ready Now rating could still be considered. But even assuming a Ready Now rating demonstrated that Pittman was more qualified than Conroy, that fact without more does not create a genuine issue of material fact that JJVC's stated reasons for selecting Conroy over her were pretextual.

Pittman has offered no evidence, outside of the readiness rating, to suggest that the disparities between Conroy's and her own qualifications "were of such weight and significance that no reasonable person, in the exercise of impartial

11

judgment, could have chosen" Conroy over her. *Springer*, 509 F.3d 1344 (internal quotation marks omitted). Pittman therefore has not established pretext on this ground.

Second, Pittman argues that JJVC used a set of shifting, nonspecific, and unevenly-applied criteria when it removed her from consideration for the promotion and that these criteria were inconsistent with the job description and success criteria for the position. Pittman contends that the shifting criteria are evidence that JJVC's reasons for denying her the promotion were pretextual. On this record we see no evidence that JJVC applied such shifting, nonspecific, or uneven criteria in removing Pittman from consideration for the Vice President of Product Management position as to establish pretext.

Pittman relies on *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994), to assert that we have "long held that unwritten criteria and individualized rationale for individual decisions, articulated only after the fact create a sufficient factual issue precluding summary judgment." Appellant's Corrected Brief at 23 (alteration adopted) (internal quotation marks omitted). In *Howard*, we reversed the district court's grant of summary judgment to the employer, BP, who had denied Howard a dealership contract, because Howard established that BP had no written criteria for the selection of dealers, that it had articulated after the fact requirements that Howard had in fact met, and that those requirements were false

12

because BP was not using the supposed requirements. *Howard*, 32 F.3d at 526-28. *Howard* is very different from the case at hand.

Here, JJVC had written criteria that it used to determine which candidate should be selected for the position. These criteria included: a strong supply chain background, strong new product introduction and innovation experience, outstanding collaboration skills, the ability to work effectively at the board or leadership team level, and the ability to continue to move on and up in J&J. Pittman points to the fact that Benson told her she was disqualified from consideration because she lacked experience outside of Vistakon, which was not listed in the criteria. She also asserts that JJVC modified the criteria throughout this litigation to explain why she was not selected, and she was disqualified based on "unwritten criteria."[5] The evidence does not support her arguments.

Although Pittman is correct that outside experience was not included in the listed criteria, "[a]t most, the jury could find that [outside experience] was an additional, but undisclosed, reason for the decision; the existence of a possible

---

[5] Pittman also asserts that JJVC applied the criteria inconsistently because Hawthorne was selected for an interview, even though he lacked experience outside of Vistakon. Hawthorne met other of the success criteria; however, like Pittman he was not considered as competitive a candidate as Conroy. And although he was interviewed, Hawthorne was not selected for the position. In *Howard*, the plaintiff demonstrated that BP in fact was not using the supposed criteria by demonstrating that others who did not meet the criteria were in fact selected, including examples of decisions that were made as a result of nepotism. *See Howard*, 32 F.3d at 526. Because Hawthorne was not selected for the Vice President position, the fact that he similarly lacked experience outside of Vistakon but nonetheless was interviewed does not establish that JJVC's reasoning was pretextual.

13

additional non-discriminatory basis for [Pittman's disqualification] does not, however, prove pretext." *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998). Moreover, the record does not establish that JJVC modified its criteria after the fact.[6] Pittman raises as an example that JJVC argued in its summary judgment motion that she was disqualified because she "lacked experience leading innovation at the senior board level and highest leadership level within an organization," but the criteria it listed for the position required only "the ability to work effectively at board/leadership team level." Appellant's Corrected Brief at 23-24 (alteration adopted) (internal quotation marks and footnote omitted). Although the identification of inconsistencies in an employer's testimony may be evidence of pretext, where the explanations are not necessarily inconsistent, they do not suggest pretext. *See Zaben v. Air Prod. & Chems., Inc.*, 129 F.3d 1453, 1458 (11th Cir. 1997). These two explanations are not necessarily inconsistent. If Pittman lacked experience leading at the senior board and highest leadership level, JJVC may have felt she did not yet have the ability to work effectively at that level.

---

[6] Pittman also argues that these modified criteria create a factual dispute precluding summary judgment because JJVC has deviated from the sole reason given at the time of the employment action—that she lacked outside experience. She asserts that Montermurno testified that lack of outside experience was the only reason she was disqualified. But the record does not support her assertion. Montermurno testified that he did not believe Pittman had a real chance because she lacked a diversity of experience outside of Vistakon within the past 15 years. Yet he also explained that the position required strong leadership and, although Pittman did not lack leadership skills, the other candidates under consideration were stronger in that respect. The record therefore does not reflect that throughout the course of this case JJVC has deviated significantly from its original reasons for not having promoted Pittman.

14

Additionally, unlike Howard who established that he met all the criteria BP offered, Pittman did not meet all of JJVC's listed criteria. *See Howard*, 32 F.3d at 526 ("BP admits Howard meets every requirement."). Included in JJVC's listed criteria for the Vice President position were outstanding collaboration skills and the ability to work effectively at the board or leadership team level. When Pittman's "Ready Now" rating was reviewed in the succession planning process, the leadership team noted that she needed to establish stronger leadership skills and collaboration experience, aside from her lack of experience outside of Vistakon. Further, the record reveals that JJVC considered outside experience to be a key qualification for the Vice President for Product Management role even before the position opened.[7]

In sum, Pittman has failed to show that JJVC's proffered reasons for failing to promote her to Vice President of Product Management is so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find the reasons unworthy of credence. *Alvarez*, 610 F.3d at 1265. Thus, she has failed to establish that JJVC's reasoning was a pretext for intentional sex discrimination. *Id.* at 1267.

---

[7] Although Pittman possessed outside experience with Ethicon, her experience there was not recent and was at a more junior level.

15

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order granting

JJVC's motion for summary judgment.

**AFFIRMED.**